## Richmond

### Samuel R. Hubbard, Jr. v. Commonwealth of Virginia.

June 22, 1959.

Record No. 4959.

Present, All the Justices.

The opinion states the case.

*J. Tivis Wicker* (*White, White & Roberts*, on brief), for the plaintiff in error.

*Reno S. Harp, III, Assistant Attorney General (A. S. Harrison, Jr., Attorney General,* on brief), for the Commonwealth.

EGGLESTON, C. J., delivered the opinion of the court.

Samuel R. Hubbard, Jr., herein referred to as the defendant, was charged in a three-count indictment with (1) making and drawing a check for the payment of money in the sum of $3,150 upon a named bank, payable to the order of Reynolds Pontiac, with intent to defraud, knowing at the time of the making and drawing of such check that he did not have sufficient funds in, or credit with, the bank for the payment of the instrument; (2) uttering and delivering the check to Reynolds Pontiac, with intent to defraud, knowing at the time of such uttering and delivery that he did not have sufficient funds in, or credit with, the bank for the payment of the instrument; and (3) larceny of a 1957 Pontiac automobile of the value of $3,150, the property of Reynolds Pontiac.

Upon arraignment and a plea of not guilty the defendant waived a trial by a jury and with the concurrence of the Commonwealth's attorney and of the court entered of record, was tried by the court. In its bill of particulars the Commonwealth charged that the first two counts were based upon the violation of Code, § 6-129, and the third upon the violation of Code, § 18-180. After hearing the evidence the court found the defendant guilty on all three counts, as charged in the indictment, and sentenced him to confinement in the penitentiary for one year on each count.

The matter is now before us on a writ of error granted the defendant who claims that the evidence is insufficient to sustain his conviction on the three counts, or any of them.

The undisputed facts are these: On Wednesday, September 18, 1957, the defendant, who was then engaged in the business of selling used cars in the city of Richmond, telephoned Chester A. Reynolds, Jr., general manager of Reynolds Pontiac at Orange, Virginia, relative to purchasing two Pontiac station wagons. Reynolds agreed to sell the defendant two such cars, one of which was owned by Reynolds Pontiac and the other by Earl Lonergan, one of its customers, and left with it for sale. About 2:00 p. m. on the same day the defendant went to Orange for the purpose of consummating the purchase of the two cars. He told Reynolds that in the conduct of his used-car business he always kept approximately twenty late model cars on

his lot, that he frequently bought new cars, and that he needed "a couple of new Pontiacs." As Reynolds said, "He [Hubbard] said his condition of business was very, very good, he gave me a very good picture of his business."

Since, the defendant said, considerable capital was required for him to carry on his business, he had made arrangements with the Savings Bank & Trust Company of Richmond for a "$20,000 floor plan," that is, a line of credit in that amount secured by liens on cars. The defendant gave Reynolds a check bearing the date of the transaction, September 18, payable to the order of Reynolds Pontiac, drawn on the Savings Bank & Trust Company, signed by him (the defendant), in the sum of $3,150, that being the agreed price of the Pontiac station wagon which he was buying from Reynolds Pontiac. He told Reynolds that he must have the title certificate to the car in order that he might use it as collateral in consummating his "floor plan" with the bank, and that from the proceeds of such arrangement with the bank "the check would be good by the time it got to Richmond." Relying upon these representations, Reynolds accepted the check and delivered the car and the title certificate thereto to the defendant. At the same time and for the same reason Reynolds delivered to the defendant the Lonergan car and the title certificate thereto.

On the next day, Thursday, September 19, the defendant telephoned Reynolds that his "floor plan" with the bank had not been completed and asked him to "hold the check." He made the same request a day or two later. On Monday, September 23, Reynolds, whose suspicions had been aroused, deposited the check in his firm's account at Orange. The check was presented to the drawee bank on September 24 and returned with the notation that the account had been closed. Reynolds then called upon the defendant at his place of business and was told, "Don't worry! I am going to get the money for you." However, the check was never paid.

An officer of the bank testified that on or about September 13, the bank had agreed to let the defendant have a $20,000 line of credit to be secured by liens on cars, provided the titles and cars were acceptable to the bank. It was further shown that on September 19, the day following that on which the defendant had obtained possession of the Reynolds car, he had obtained a loan of $5,500 from the Savings Bank & Trust Company on that car and the Lonergan car which he had also purchased through Reynolds Pontiac. While

the proceeds of this loan were deposited to the defendant's credit in that bank, they were exhausted by checks presented on the same day. At the request of the bank the account was closed on September 23, the day before the check with which we are here concerned was presented.

It was also developed from the Commonwealth's evidence that during the period from July to September 13, 1957, the defendant had engaged in the same type of transaction with four other automobile dealers within a radius of 100 miles of Richmond. Under similar circumstances each of these dealers, in return for a worthless check, gave the defendant possession of a car or cars and the certificate or certificates of title therefor. In a similar fashion, the defendant obtained loans on these cars which precluded the dealers from recovering possession of them.

The first question presented is whether the related facts will support a conviction for the violation of Code, § 6-129, upon which the first two counts are based. The pertinent portion of this section reads:

"§ 6-129. *Issuing bad checks, etc., larceny.*—Any person who, with intent to defraud, shall make or draw or utter or deliver any check, draft, or order for the payment of money, upon any bank, banking institution, trust company, or other depository, knowing, at the time of such making, drawing, uttering or delivering, that the maker or drawer has not sufficient funds in, or credit with, such bank, banking institution, trust company, or other depository, for the payment of such check, draft or order, although no express representation is made in reference thereto, shall be guilty of larceny."

Corollary to this section is the rule of evidence laid down in Section 6-130, which provides in part: "In any prosecution under the preceding section, the making or drawing or uttering or delivery of a check, draft, or order, payment of which is refused by the drawee because of lack of funds or credit, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in, or credit with, such bank, * * *."

It is undisputed that the defendant drew and uttered the worthless check, knowing at the time that he did not have sufficient funds in, or credit with, the bank on which it was drawn. As we shall presently see, there is sufficient evidence to warrant the finding that he did this with intent to defraud Reynolds Pontiac, the payee of the instrument. But the evidence also shows, and the lower court so found in

its opinion dictated from the bench, that the check was not given for a "present consideration," and that there would be some delay in its payment. Indeed, it is clear from Reynolds' testimony that he knew when he received the check that it was not then collectible and would not be "good" until the defendant had made further arrangements with the bank on which it was drawn.

"The general rule is that the making and delivery of a check amounts to a representation that the check is good and that a representation extrinsic to the check itself is not a necessary element of an offense under worthless check acts." 22 Am. Jur., False Pretenses, § 64, p. 477. Indeed, Code, § 6-129, in terms, dispenses with the proof of such "express representation." See *Holt Motors* v. *Casto*, 136 W. Va. 284, 67 S. E. 2d 432, 435, construing the Virginia statute.

Conversely, it is universally held that where, as here, at the time the check is drawn or delivered to him, the payee has knowledge, or an understanding, that it is not then good or collectible, the offense prohibited by statutes of this character has not been committed. 35 C. J. S., False Pretenses, § 21, pp. 659, 660; 22 Am. Jur., False Pretenses, § 66, p. 479; *People* v. *Jacobson*, 248 Mich, 639, 227 N. W. 781, and cases there cited. Cf. *Turner* v. *Brenner*, 138 Va. 232, 235, 236, 121 S. E. 510. This is so because there is then no false representation that the check is good, which is a necessary element of the offense at which the statute is directed.

It necessarily follows, then, that the evidence is insufficient to sustain a conviction under the first and second counts of the indictment and the defendant should have been acquitted of the charges as therein laid.

The pertinent portion of Code, § 18-180, under which the third count of the indictment is laid, reads thus: "If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof; * * *."

As this court has previously pointed out, to constitute the offense described in the statute four things must concur: (1) There must be an intent to defraud; (2) there must be an actual fraud committed; (3) false pretenses must be used for the purpose of perpetrating the fraud; and (4) the fraud must be accomplished by means of the false pretenses made use of for the purpose, that is, they must be in some degree the cause, if not the controlling and decisive cause, which induced the owner to part with his property. *Anable* v. *Common-*

*wealth*, 24 Gratt. (65 Va.) 563, 567, 568; *Hagy* v. *Commonwealth*, 168 Va. 663, 666, 190 S. E. 144, 145.

A criminal false pretense has been defined to be "the false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does in fact deceive, and by means of which one person obtains value from another without compensation." 35 C. J. S., False Pretenses, § 1, p. 636. According to the definition, the false pretense must be a representation as to an existing fact or past event. False representations amounting to mere promises or statements of intention have reference to future events and are not criminal within the statute, even though they induce the party defrauded to part with his property. 22 Am. Jur., False Pretenses, § 14, p. 452; 35 C. J. S., False Pretenses, § 8, p. 646. But if false representations are made, some of which refer to existing facts or past events, while others refer solely to future events, a conviction may be had if it is shown that any of the representations as to existing facts induced the complaining witness to part with his property. 35 C. J. S., False Pretenses, § 8, p. 647; 22 Am. Jur., False Pretenses, § 14, p. 452.

Tested by these principles, we hold that the evidence on behalf of the Commonwealth is sufficient to sustain a conviction under this statute, on which the third count is based. The evidence shows the intent to defraud, the commission of an actual fraud, and the use of false pretenses for the purpose of perpetrating a fraud, which induced the prosecuting witness to part with his property.

The false representations were not, as the defendant claims, merely promissory in nature. Just before the sale of the car was consummated the defendant represented to Reynolds that the condition of his business was "very, very good." He also represented to this witness that he had arranged for a "$20,000 floor plan" with the Savings Bank & Trust Company of Richmond, and that as the result of such plan he would have in bank sufficient funds to meet the check when it was presented for payment. Both of these representations were false because the evidence clearly shows that his business was not in sound condition, nor had he in fact consummated the necessary arrangements with the bank in order to insure the payment of the check which he gave Reynolds. Indeed, the records of the bank show that he had overdrawn his account on September 17, the day before he purchased the car from Reynolds. When he obtained from the bank a loan on the two cars which he had purchased from

or through Reynolds, and deposited the proceeds, the fund was immediately exhausted by checks which he had previously drawn and which were presented to the bank before his check to Reynolds reached there. He is bound to have known this condition.

Moreover, this was not an isolated transaction. As has been said, the evidence on behalf of the Commonwealth shows that by reason of similar false pretenses the defendant had perpetrated similar frauds about the same time on other persons and by means of such false representations had obtained cars from them. This evidence was admissible as bearing on his fraudulent intent. *Trogdon* v. *Commonwealth*, 31 Gratt. (72 Va.) 862, 870 *ff*. See also, 35 C. J. S., False Pretenses, § 51-c, pp. 711, 712; 22 Am. Jur., False Pretenses, § 109, p. 506.

The judgment under review will be modified by finding the defendant not guilty as charged in counts 1 and 2 of the indictment and setting aside the sentences imposed pursuant to convictions under these counts. The judgment finding the defendant guilty as charged in the third count of the indictment and sentencing him to confinement in the penitentiary for one year pursuant thereto, is affirmed.

*Modified and affirmed.*