237 S.E.2d 803 (1977)
William P. RIEGERT
v.
COMMONWEALTH of Virginia.
Record No. 761371.
Supreme Court of Virginia.
October 7, 1977.
*804 Laurence G. Roman, Vienna (Joseph Semo, Roman, Lechner & Seifman, Vienna, on brief), for plaintiff in error.
Jim L. Chin, Asst. Atty. Gen. (Anthony F. Troy, Atty. Gen., on brief), for defendant in error.
Before I'ANSON, C. J., and CARRICO, HARRISON, COCHRAN, HARMAN, POFF and COMPTON, JJ.
COMPTON, Justice.
In this criminal appeal, we examine the evidence to determine whether it is sufficient to convict the defendant of larceny by false pretenses. We also consider whether duly-attested abstracts of civil money judgments against the defendant were admissible as evidence in this criminal trial and whether the defendant was prejudiced by references made during the trial to a proceeding in which defendant was adjudicated a bankrupt. We find error in all three instances and reverse the conviction.
Defendant William P. Riegert was indicted on November 24, 1975 for "steal[ing] property of Haywood L. Darnell having a value of approximately $5350.00. Va.Code §§ 18.1-100,[1] 18.1-118.[[2]]" Tried by a jury on June 8, 1976, defendant was found guilty as charged and his punishment was fixed at confinement in jail for 90 days and a fine of $1,000. To the trial court's June 18, 1976 judgment of conviction, which confirmed the jury's verdict, we awarded defendant a writ of error.
Viewed in a light most favorable to the Commonwealth, the evidence discloses these facts. On Saturday, January 11,1975, Darnell, an auctioneer, pursuant to a contract with Mrs. John G. Carpenter, conducted an auction on the Carpenter property in Orange County to dispose of a part of the estate of Mrs. Carpenter's deceased husband. Among the items advertised to be sold at the auction were livestock and "app[roximately] 8,000 Bales" of hay.
One of those attending the auction was the defendant Riegert, who resided in Northern Virginia and who had received a brochure publicizing the event. Riegert, a developer and contractor for five years who planned to buy a farm, had purchased hay (20 bales) only once before.
*805 Prior to commencement of the bidding on the hay, Darnell announced to the audience that the hay would be sold in bulk and not by the bale. He also stated several times to the group that less hay than advertised was available for sale; he invited those who planned to bid on it to carefully examine the quantity of hay, which was stored at several different locations on the Carpenter property. Although the defendant testified to the contrary, the Commonwealth's evidence showed that Darnell said nothing to the group about making any "adjustment" in case the lot of hay actually bought by the successful bidder was less than the purchaser thought he was buying. According to the testimony, the audience was told by Darnell that "what you seen is what you are buying."
The defendant was the high bidder in the amount of $3850 on hay which was stored in a barn near the auctioneer's tent. The evidence showed that this barn contained, at the most, 4500 bales. Defendant also bought six head of cattle for a total of $1500. He then wrote a personal check to Darnell's order drawn on the Guaranty Bank and Trust Company of Fairfax, Virginia, for $5350 dated the day of the auction. Written in the margin on the face of the check, apparently by the defendant, was "auctionOrange6 head & 8,000 Hay." The check was delivered on the day of the auction and defendant was given a statement from Darnell showing that $3850 was paid for "Hay in Barn." Defendant moved the cattle and "some of the hay" from the site on that day.
Darnell, testifying for the Commonwealth, stated that on the Wednesday following the auction, defendant called him complaining that only about 2800 bales of hay were in the barn and seeking an adjustment in the price, which Darnell refused. On the following Friday, January 17, 1975, defendant orally ordered Guaranty Bank to stop payment on the Darnell check,[3] which was done. After learning of the stop-payment, Darnell contacted defendant who said "he liked the cows" but again complained about the quantity of hay and told Darnell "you have got to do something about the hay." Darnell again refused to make any adjustment and, when he was unable to "get any satisfaction out of [Riegert] at all", subsequently contacted an Orange County attorney who suggested that Darnell bring a civil suit to recover the amount due.
Defendant continued to remove the hay after payment was stopped on the check and eventually removed it all. Two hundred and fifty bales were sold by defendant for one dollar a bale on the day of the sale to a West Point, Virginia, contractor who attended the auction.
A civil judgment for $5350 was obtained in favor of Darnell against Riegert after a jury trial on July 18, 1975 at which Riegert appeared by counsel only. At the time of his criminal trial almost one year later, this civil judgment remained unsatisfied. Defendant testified that on July 22, 1975 he offered to satisfy the judgment by paying Darnell $5000. Darnell denied that any such offer was ever made.
The Commonwealth called as a witness William W. Duncan, who, during late 1974 and early 1975, was in charge of the bookkeeping department of the Guaranty Bank. Testifying from bank records, Duncan stated that on the day before the auction, Riegert had a balance of $510.93 in his checking account and that this balance had dropped to $286.93 by January 17, the day the bank received the stop-payment order. The records also showed that on January 14 a check drawn on the account for $460 was returned as an overdraft.
Duncan stated that during the first three weeks of January there was "some activity" in Riegert's account but that no loans were actually made to defendant. He testified, however, that Riegert was "over collateralized" with the bank, meaning that defendant had "excessive collateral on deposit with the bank for some thirty thousand odd dollars. . . ." Duncan said that it was "not inconceivable that additional monies *806 would be made available to [defendant]", but that such additional sums were not advanced because "[a]pparently they were not requested." On cross-examination, Duncan stated that in order for additional sums to be made "available", the bank required "a formal request from either Mr. or Mrs. Riegert or both for . . . an additional loan to be made to them."
Duncan further stated that the bank made loans by allowing overdrafts. He stated that when there were insufficient funds in an account to pay a check, a branch manager or loan officer who had knowledge of the depositor's financial condition made the decision whether to pay that particular overdraft. In response to questions from the trial court, interjected during cross-examination, Duncan explained that the January 14 overdraft was not paid but was returned "for insufficient funds" because "apparently" the particular loan officer on that occasion decided not to permit the overdraft.
When asked to describe "the bank's practice with respect to stopping payment on a check where there [were] insufficient funds in the account to cover that check", Duncan testified:
"The policy of the bank in dealing with stop payment is that we will not accept a stop payment on a check if the balance of the account is less than the amount of the check being requested that stop payment be placed on. In other words, if a check is requested to have a stop payment placed on it and the balance of the account is less than the amount of the check it's the policy of our bank that we will not accept that stop payment. . . ."
Duncan further testified that he personally issued the stop payment on the check in question and that when the order was received from Riegert,
"I had a telephone conversation with a loan officer, I cannot tell you the individual's name at this point because it's one of many, who authorized me to place a stop payment on this check which would indicate that funds were available to pay the check through the bank resources. I had that conversation with the loan officer and that loan officer authorized the stop payment."
Duncan also answered "correct" to the question: "[I]f no prior arrangements had been made to pay the check the bank would not have issued the stop payment . . . ?"
On redirect examination, when asked whether defendant was treated as a customer in a different manner in January 1975 than in February of the same year, Duncan testified that Riegert's account with the bank during those months "was always handled with the same attitude and atmosphere within the bank." He stated that if there were additional overdrafts in February, they "might not [be paid] but on the other hand they might [be paid]." Duncan then testified, when handed defendant's February bank statement, that during the month one overdraft was "apparently" paid and three others were "returned."
The defendant's evidence, a great deal of which was obviously rejected by the jury, showed the following facts. He testified that he wanted to fulfill "a dream to live on a farm some day and work the farm", so he commenced purchasing cattle and looking for a farm to buy during the Fall of 1974. Riegert, 33 years of age, bought about 50 head of cattle in October and November and intended to buy other cattle in December. In order to finance that anticipated purchase, and the purchase of hay to feed the cattle, defendant said that he, along with a friend, had arranged to borrow $11,000 from the Federal Land Bank. Introduced into evidence was a copy of a promissory note in that amount dated January 13, 1975, payable to the Warrenton Production Credit Association executed by defendant, his friend and their respective wives.[4] Defendant *807 said he had applied for the loan in December after he had learned of the Carpenter auction.
Defendant further testified that because he had not obtained the loan proceeds from the Federal Land Bank, during "the week prior to the auction" he went to Guaranty Bank and advised one Jim Newsome, described as the Executive Vice President of the bank, of the land bank loan application. He told Newsome he "had never been to an auction before" so he did not know the amount he would have to pay for his purchases and indicated to Newsome he did not want his purchases to exceed "ten or eleven thousand dollars." According to Riegert, Newsome told defendant "to go ahead and write a check", stating that he would "approve the check when it came in to be paid." Defendant testified that Newsome said the bank would "pay the check at the time it came in." Newsome did not testify at trial.
Riegert further testified that he was the "owner of a major subdivision." He stated that Guaranty Bank "financed all of the properties" and "collected the notes" for defendant while "holding" the first deeds of trust which defendant "signed over [to the bank] as collateral." He stated that when he "needed money," he could "draw" against the collateral and this was the "basis" of his "lending strength."
Riegert testified that on the day of the auction Darnell stated to the audience that about 6,000 bales of hay were available for sale and that "compensation would be made" for "an excessive amount of discrepancy." He further testified that he did not examine the hay before the purchase to estimate the number of bales he was buying. He said he thought he "had bought right around 6000 bales" but that he was later told "there was only 2800 or 2900 bales of hay actually counted."
Defendant denied he intended to defraud Darnell and stated that, in spite of several telephone conversations with Darnell during the three days following the sale and a meeting with Mrs. Carpenter at her home on January 14, he was unable to "resolve" the matter. Riegert testified he "didn't know what to do about [the controversy]", so on January 17 he called Guaranty Bank seeking advice and talked "to a loan officer" who said "well, probably the correct thing to do is put a stop payment on the check and work the thing out with the auctioneer." Riegert said the loan officer called Duncan in the bookkeeping department and ascertained the check "had not come in" and thereupon defendant issued his order to stop payment.
Riegert attempted to explain his conduct in continuing to remove the hay from the Carpenter premises, even after payment of the check was stopped, by saying that he thought the controversy was "going to be worked out." He testified: "All I was looking for was compensation in regards to the hay that Mr. Darnell had mentioned to me and to everybody else."
In order to sustain a conviction for larceny by false pretenses, the Commonwealth must prove: "(1) an intent to defraud; (2) an actual fraud; (3) use of false pretenses for the purpose of perpetrating the fraud; and (4) accomplishment of the fraud by means of the false pretenses used for the purpose, that is, the false pretenses to some degree must have induced the owner to part with his property." Bourgeois v. Commonwealth, 217 Va. 268,272, 227 S.E.2d 714, 717 (1976).[5] In this context, the false *808 pretense must be a representation as to any existing fact or past event. Id.; Hubbard v. Commonwealth, 201 Va. 61, 66, 109 S.E.2d 100,104 (1959). But merely showing that the accused knowingly stated what was false is not sufficient; there must also be proof that his intent was to defraud. Trogdon v. Commonwealth, 72 Va. (31 Gratt.) 862, 872 (1878).
Furthermore, the fraudulent intent must have existed at the time the false pretenses were made, by which the property was obtained. Fay v. Commonwealth, 69 Va. (28 Gratt.) 912, 918-19 (1877). And in order to determine whether the intent to defraud existed at the time the act was committed, the conduct and representations of the accused must be examined, since intent is "a secret operation of the mind." Trogdon v. Commonwealth, supra, 72 Va. at 872.
As to the sufficiency of the evidence, the Attorney General argues, reviewing the facts, that each element of the offense has been properly established. We disagree. We need only focus on whether the Commonwealth has proved that a present intent to defraud existed in the mind of defendant when the check in question was delivered, on January 11, 1975, because we think the requisite proof of that element is lacking.
The main thrust of the Attorney General's argument on this issue is directed to proof of "inadequacy of the defendant's bank account" and "the absence of any effort on the part of the defendant to seek credit or [a] loan to be deposited to his account to cover the check to Darnell in light of the notice of January 14, 1975, attached to the returned check. . . ." But the Commonwealth's own evidence failed to carry the prosecution's burden to exclude every reasonable hypothesis save that of guilt; rather, it established facts which were consistent with defendant's innocence.
In the first place, the Commonwealth's witness Duncan testified that he, in accordance with bank policy and pursuant to proper authorization, placed the stop-payment order on the check, even though the account contained insufficient funds to cover it, and that the fact of such authorization "would indicate that funds were available to pay the check through the bank resources." He also indicated that the stop-payment order would not have been issued by the bank unless "prior arrangements" had been made by the depositor for the bank to pay the check. To be inferred from this evidence is the fact, consistent with defendant's innocence, that, even though the defendant had insufficient funds in his checking account to pay the check when issued, Riegert had made arrangements prior to January 17, and even prior to the date of issuance, to have the check honored. Manifestly, such evidence negates the existence on the day of the auction of any intent to defraud in the mind of the accused. This is evidence that Riegert issued and delivered the check fully intending, at that time, that it would be paid, having made prior arrangements with the bank for it to be "covered." But that is not all.
The fact that defendant waited until January 17 to stop the payment of the check likewise militates against a finding of the necessary intent to defraud. There were at least four normal banking business days between January 11 and January 17 during which the check could have been presented and presumably paid, according to the evidence we have just discussed. If defendant intended, when the check was delivered, to use the stop-payment device to defraud Darnell, the accused would not have given Darnell the time and opportunity to negotiate the check before such stop order was issued.
And the evidence of the January and February overdrafts, which were returned for insufficient funds, fails to save the Commonwealth's case. The prosecution's *809 own witness explained that overdrafts were not converted into loans and paid unless a "formal request" for an additional loan to cover the overdraft had been made or unless the specific bank officer handling the transaction decided to permit the overdraft. Thus, it is reasonable to conclude, consistent with defendant's innocence and contrary to the handling of the Darnell check, that as to the overdrafts returned, no "formal request" by defendant had been made nor had any officer approval been given in connection with those particular transactions.
For these reasons, we hold the circumstantial evidence that the defendant entertained an intent to defraud at the time of the act in question insufficient to sustain the conviction. The Commonwealth, as a matter of law, has failed to overcome the presumption of innocence and has failed to exclude all reasonable conclusions inconsistent with Riegert's guilt.
Because there may be a retrial of the defendant after remand, we address the other two issues presented.
Over the strenuous objection of the defendant, the trial court permitted the prosecutor, as a part of the Commonwealth's case-in-chief, to introduce as exhibits duly-attested abstracts of 14 civil money judgments obtained against the defendant during the period from January 11, 1974 to January 13, 1975. On their face, the exhibits showed that one judgment had been satisfied in full and three had been partially paid. The defendant testified that many of the other judgments had also been satisfied. The Attorney General contends the abstracts were admissible to establish the "collateral fact" of "the financial condition of the defendant and his intent with respect to the check he gave to Darnell." We reject that contention.
Standing alone, mere evidence of judgments, satisfied or unsatisfied, is of insufficient probative value to establish either a defendant's financial worth or an intent to defraud under these circumstances. It is common knowledge that the fact of judgment indebtedness is but one element in a composite statement of financial condition. The most affluent and solvent person may have judgments outstanding. Thus, even assuming that overall financial status may be probative to show intent in a case such as this, to allow the Commonwealth, in this manner, to fix upon only one aspect of defendant's apparent ability to pay his debts was erroneous and prejudicial to the accused.
Finally, the trial court allowed the prosecutor, over objection, to cross-examine the defendant from a bankruptcy petition and its schedules filed on defendant's behalf on February 10,1976. The documents were not received as exhibits in this case and they are not a part of the record on appeal. From the evidence, it appears that the bankruptcy adjudication, based on a voluntary petition, was on April 12, 1976. Stating that the questions based on the bankruptcy documents would not be restricted to the period near January 11, 1975, the trial court permitted the Commonwealth's Attorney to interrogate defendant on portions of the documents, bringing before the jury such facts as an apparent indebtedness to a bank on January 1, 1975 of $39,000, a "November 18" partial payment on a loan for $47,000 obtained on May 15, 1973, and "foreclosure of property" at some undisclosed time.
The Attorney General contends for the correctness of such procedure, stating that "the Bankruptcy Act does not prohibit such evidentiary use." The trial court allowed the interrogation because the defendant had "put in issue his business record and his personal record . . . to a certain extent and it is proper [for the defendant] to be examined upon that." We disagree.
The mere fact of a bankruptcy adjudication made 15 months after the alleged crime is, of itself, prejudicial to the defendant under these circumstances, because it is too remote in time to have any proper relevance to the defendant's state of mind on January 11, 1975 or to his financial condition on that date. Moreover, drawing from the bankruptcy documents isolated facts through the medium of cross-examination *810 highly prejudiced the accused in this case for the reasons we have just stated in our discussion of the civil judgment issue.
Not cited by either party to this appeal, but worthy of consideration on this point, is Trogdon v. Commonwealth, supra. There, in a prosecution for larceny by false pretenses, this court held admissible the entire record of a defendant's bankruptcy. 72 Va. at 880. But in that case, the bankruptcy petition had been filed only one month after the defendant's representations of solvency out of which the prosecution arose. In addition, the basis of the indictment there was that defendant had obtained property on credit which had been extended to him as the result of his claims of financial stability. Thus, Trogdon is distinguishable on its facts and is not controlling here.
For the foregoing reasons, the judgment of conviction will be reversed and the case remanded for a new trial, if the Commonwealth be so advised.
Reversed and remanded.
NOTES
[1] Code § 18.1-100 (Cum.Supp.1975), now § 18.2-95, in pertinent part, provided:

"Any person who: . . .
"(2) Commits simple larceny not from the person of another of goods and chattels of the value of one hundred dollars or more, shall be deemed guilty of grand larceny. . . ."
[2] Code § 18.1-118 (1960 Repl.Vol.), now in substance § 18.2-178, in pertinent part, provided:

"If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof; . . . ."
[3] See Code § 8.4-403.
[4] In rebuttal, the Commonwealth called an official of the Federal Land Bank in Warrenton who confirmed that a "joint loan" was made to defendant and his friend for the purchase of cattle only, with the funds being disbursed January 23, 1975. He said the application for the loan was made January 9, 1975. The officer described defendant's friend as the "prime maker" of the note and defendant as "the endorser, the co-signer."
[5] Compare the "bad check" statute, then Code § 6.1-115 (1973 Repl.Vol.), with the statute under which defendant was prosecuted, note 2 supra. The former statute, now in substance § 18.2-181, provided in pertinent part as follows:

"§ 6.1-115. Issuing bad checks, etc., larceny.Any person who, with intent to defraud, shall make or draw or utter or deliver any check, . . . . upon any bank, . . . knowing, at the time [of] such making, drawing, uttering or delivering, that the maker or drawer has not sufficient funds in, or credit with, such bank, . . . for the payment of such check, . . . although no express representation is made in reference thereto, shall be guilty of larceny.
* * * * *
"The word `credit,' as used herein, shall be construed to mean any arrangement or understanding with the bank, . . . for the payment of such check . . . ."