[No. H007436. Sixth Dist. Oct. 23, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DEBRA WOLFE, Defendant and Appellant.

## COUNSEL

Suzanne H. Paboojian, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Christopher J. Wei and Sharon Rosen Leib, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COTTLE, J.**—Sandy Harris, owner and manager of Pacific Coast Screen Printing (hereinafter PCSP) in Milpitas, began doing business with defendant Debra Wolfe in April 1987. Defendant set up an account with Harris for PCSP to supply her business, Air Wolfe, with printed T-shirts and sweat shirts for defendant to distribute to military shows throughout the country. In July and August of 1987 Harris received three checks from defendant to pay for shirts PCSP printed and delivered to Air Wolfe. The checks bounced and were never made good.

As a result, defendant was charged with three counts of issuing checks without sufficient funds (Pen. Code, § 476a, subd. (a)). In the jury trial which ensued, defendant was found guilty of counts I and III; the trial court acquitted defendant on count II pursuant to Penal Code section 1118.1. Defendant was sentenced to three years and eight months in state prison and ordered to pay a $5,000 restitution fine and an additional $7,511.73 in restitution to the victim.

Relying upon the authority of *People* v. *Poyet* (1972) 6 Cal.3d 530 [99 Cal.Rptr. 758, 492 P.2d 1150], defendant contends the evidence was insufficient to support her two convictions for passing checks on insufficient

funds. After reviewing the holding and underlying analysis in *Poyet*, we agree and reverse.

■ In *Poyet*, the California Supreme Court agreed with the following analysis set forth in *Hubbard v. Commonwealth* (1959) 201 Va. 61, 64-65 [109 S.E.2d 100]: " '[W]here . . . at the time the check is drawn and delivered to him, the payee has knowledge, *or an understanding*, that it is not then good or collectible, the offense [of issuing a worthless check] has not been committed. [Citations.] This is so because there is then no false representation that the check is good, which is a necessary element of the offense at which the statute is directed.' " (6 Cal.3d at p. 536, italics added.) The court in *Poyet* concluded that "[n]o matter how fraudulent the promise to make a deposit sufficient to cover the check, disclosure of the present insufficiency of funds precludes conviction under . . . section [476a]." (*Ibid.*) In so holding, the court noted that the fact alone that a check is postdated is not a defense to Penal Code section 476a. (6 Cal.3d at p. 534.)

■ In this case, Sandy Harris testified that he specifically understood that the check for $7,300 underlying the charge in count II had been postdated "because the funds were not in that account at the time it was written." The trial court properly granted defense counsel's Penal Code section 1118.1 motion to dismiss count II based upon *Poyet*. ■ We conclude that Harris's testimony shows that, beyond his specific understanding regarding the check underlying the charge in count II, Harris had an ongoing understanding with defendant that her " 'check[s] [were] not given for a "present consideration," and that there would be some delay in [their] payment' " (*Hubbard v. Commonwealth, supra,* 201 Va. at p. 64), and that this understanding was in effect at the time defendant issued the checks involved in counts I and III. Such an understanding "precludes conviction under . . . section [476a]." *People v. Poyet, supra,* 6 Cal.3d at p. 536.)

Harris testified that he and defendant first arranged for the shirts to be paid for "on a COD (cash on delivery) basis." PCSP first delivered T-shirts to defendant in April 1987 and on April 24, 1987, defendant issued a check for $5,512 to pay for the goods. When the check bounced, defendant explained to Harris that she was "at a show" and had been unable "to get her money in the account in time . . . ."

Harris redeposited the April 24, 1987, check, and it bounced again. He then sent his controller, Mike Murphy, to Lancaster, where defendant lived, to find her and straighten out the bad check situation. Murphy returned with a new check from defendant as payment for the first shipment, and this check cleared. Because defendant "convinced" Harris that the situation

surrounding this first bounced check "wasn't really something she had control of," Harris continued to do business with her.

When PCSP made a second delivery to defendant, she wrote PCSP a check for $2,000. When that check bounced, defendant again explained to Harris that she "wasn't able to get to her bank for whatever show she was at." Harris redeposited the check which then cleared, and Harris continued to believe that the reasons defendant gave for her checks bouncing were legitimate.

Harris testified that he and defendant then devised an "arrangement" in which she would pay him by check prior to a weekend air show, but that Harris would wait to deposit the check until the following Monday or Tuesday "because *by that time [defendant] would have her proceeds from the show and her check would be good.*" (Italics added.) Harris added, "That's why the checks were postdated."[1]

For a period of months Air Wolfe placed more orders with PCSP and paid on schedule. For example, in June 1987, Harris received a check from Air Wolfe for $8,000, which he cashed without incident. Harris testified that during that same period he received cash payments from defendant on at least two occasions; once he received approximately $5,000 in cash from defendant in a Federal Express mail packet. Air Wolfe's orders became more frequent and larger, and Harris knew that defendant "was making a very, very nice return on her investment." He understood that any problem in his getting paid by defendant "*was just logistical as far as getting the money into the account in time. That's what I was told and that's what I believed.*" (Italics added.) The total product sent to Air Wolfe in the course of Harris doing business with defendant was "around fifty thousand dollars, give or take twenty." This case involves the last three separate occasions defendant issued Harris checks for merchandise. It is those three checks, which were returned for insufficient funds and were never made good, which led to the instant prosecution.

In August 1987 PCSP received from defendant a check for $1,883.64 dated August 4, 1987. This check underlies the conviction in count I. We take judicial notice that August 4, 1987, was a Tuesday. Consistent with the arrangement between Harris and defendant, the check was first deposited after the weekend on the following Tuesday, August 11, 1987. When the check arrived at Security Pacific Bank for payment on August 14, 1987, it

---

[1]On the other hand, Harris denied defendant's claim that he and she had an arrangement whereby defendant wrote him a check as collateral which he tore up upon receiving a cash payment; according to Harris, it was always understood that a check from defendant would be a good, negotiable form of payment.

was not honored as Air Wolfe's account had a balance of $18 at the time. Harris redeposited the check on August 24, 1987; it was returned again for insufficient funds because Air Wolfe's account had a balance of $1,794.71 at that time. Although Harris testified that no specific representation was made to him or was reflected on the check that it was postdated and shouldn't be cashed immediately, the check dated August 4, 1987, has been transmitted to this court pursuant to California Rules of Court, rule 10(d), and an examination of it reveals a two letter notation above the date that appears to be in the defendant's handwriting. While the second letter of the notation is unclear but could be a capital "D", the first letter appears similar to the capital "P" which appears elsewhere on the same check. In any event, Harris testified that, because of "the arrangement in the past," when the check bounced, he "thought it would be taken care of."

PCSP next received a check from defendant for $7,300 which had the words "postdated for August 26, 1987" in the upper right corner and "postdated" in the lower left corner. Harris deposited this check on August 26, 1987, and the check bounced. As noted above, Harris testified that he understood that this check, which underlies the charge in count II, had been postdated "because the funds were not in that account at the time it was written . . . ."

Before the check underlying count II bounced, Harris received defendant's check underlying the charge in count III for $3,823; although the check was dated September 5, 1987, with "P.D." written over the date, Harris deposited the check on August 31, 1987, and it bounced. Harris admitted that the "P.D." on the third check "could have meant it might have been postdated."

Throughout his testimony, Harris repeatedly described the ongoing understanding he had with defendant that she would give him checks for merchandise before air shows with the understanding that the funds for the checks would be deposited after the air shows.

On direct examination, Harris testified that "[w]hat would happen, she would have a show, for example, that would be on a given weekend because the shows were generally, I believe, almost all the time on weekends. What she would do is if she had whatever amount of product she needed for the show, she would give us a check and it would generally be [post]dated. So like the following Monday or Tuesday we could go ahead and deposit it, because by that time she would have the proceeds from the show and her check would be good. That's why the checks were postdated."

On cross-examination, Harris explained that "Debra Wolfe told me or indicated to us the date that the checks would be good at the bank." Harris

also explained that the dates he was told the checks would be good "were not necessarily the dates [he] received the checks . . . ." Harris admitted that his arrangement with defendant was that he would receive defendant's checks "before the air show" and that defendant "was supposed to have the funds in the bank immediately after the air show." "My understanding was she was going to make money off the product we sold her at the air shows, she would deposit that in her account. That's when she wanted the check to go through." Harris reiterated, *The arrangement was she would give us a check, we would provide her with product, she would sell the product, supposedly put the money in the account after she got the proceeds from the sale, and we would put the check in.*" (Italics added.) Harris reluctantly conceded that his arrangement with defendant "probably" constituted holding her checks "as collateral for payment."

When Harris was recalled near the end of the trial, he testified that "[t]he relationship in August of '87 was the same as the relationship from the beginning. She would issue me a check and we would deposit the check after the weekend of the air show and the checks were to be made good."

The prosecutor in his closing argument to the jury conceded that what defendant was saying to Harris "is, 'Look, you do business with me, I'll write you a check. *I don't have any money in my account.*' [¶] And then what she does, 'The business doesn't go well for me, screw you, pal. You are on the hook with me. And I'll pay you when my business is good and when I get around to doing it.' " (Italics added.) The prosecutor then argued that this conduct revealed "an intent to defraud . . . ." Near the end of his argument, the prosecutor told the jury that if it disregarded defendant's testimony "you are left with a crime" and "a woman who did a systematic series of crimes here with these checks, got the items and took off with them and then put [Harris] on the hook here, 'And if you want to get paid, Pal, you keep supplying me. If I make money, you will get paid. If I don't, too bad.' "

While the prosecutor may have been correct that the conduct he described, which matched the business arrangement which Harris had described, constitutes "a crime," that crime is not the one for which defendant has been convicted. Once Harris and defendant entered into their "arrangement" in which defendant would write Harris checks which he "received before [an] air show," with the knowledge that "she was supposed to have the funds in the bank immediately after the air show" because "she was going to make money off the product [PCSP] sold her at the air shows," Harris was on notice that when defendant's checks were delivered to PCSP, as the prosecutor conceded in argument, defendant " '[did]n't have any money in [her] account.' " ▓▓▓▓ As noted above, such an understanding of present

insufficiency precludes a conviction under section 476a because defendant's promise to make a deposit after each air show with which to meet her checks " 'was no more than a promise to pay . . . . Notwithstanding under certain circumstances promises made in bad faith as to future conduct may be the basis of a charge of fraud,[2] such is not the offense embodied in this statute.' [Citations.]" (*People* v. *Jacobson* (1929) 248 Mich. 639, 642-643 [227 N.W. 781], cited with approval in *People* v. *Poyet*, *supra*, 6 Cal.3d at p. 535.)

The Attorney General's attempt to ignore the import of Harris's repeated testimony which explained his ongoing understanding that defendant would give him a check before a weekend air show with a promise that she would make a deposit from the proceeds from that air show early the following week to meet the previously issued check is unconvincing. In support of the position that "Harris' testimony provided sufficient evidence" to support the convictions for issuing checks without sufficient funds, the Attorney General cites the following single portion of the transcript: "Q [defense counsel] And it was your understanding that the reason she had you wait until the designated date was because she didn't have the money in the account to cover the check at that time, correct? [¶] A. [Harris] No. [¶] Q. What was your understanding? [¶] A. My understanding was she was going to make money off the product we sold her at the air shows, she would deposit that in her account. That's when she wanted the check to go through. . . . [¶] Q. Was it your understanding that there wasn't money in the account before the date you deposited the check? . . . [¶] A. No, that was not my understanding." What is significant is the Attorney General's omission of the remainder of Harris's response; on the same page in the transcript, Harris reiterated that his "understanding" and "arrangement" with defendant was that "she would take our product that we would sell to her, sell it at a show that weekend, put the money in her account on Monday or Tuesday, we would deposit the checks at that point in time. . . . [¶] . . . she would give us a check, we would provide her with product, she would sell the product, supposedly put the money in the account after she got the proceeds from the sale, and we would put the check in." Harris's single statement taken out of context relied upon by the Attorney General does not constitute substantial evidence to support the instant convictions.

In this case, as in *Poyet*, "[w]e do not condone defendant's conduct nor do we feel that it was lawful. ■ '[A] promise made without intention to perform is a misrepresentation of a state of mind, and thus a

---

[2]In fact, the trial court commented that it had erroneously granted the judgment for acquittal as to count II because it "had fully intended to give the prosecution an opportunity to amend Count Two to the grand theft charge."

misrepresentation of existing fact, and is a false pretense within the meaning of section 484 [and section 487] of the Penal Code.' (*People* v. *Ashley*, [1954], 42 Cal.2d 246, 262 [267 P.2d 271].) . . . The evidence here . . . is more than sufficient to show that the failure to keep the promise was not merely a commercial default and that a conviction could have been sustained upon a proper charge under Penal Code section [487]." (*People* v. *Poyet*, *supra*, 6 Cal.3d at p. 537.)

Since proceedings on a correct charge may not now be commenced (Pen. Code, § 801), we need not reach the remaining contentions on appeal. (*People* v. *Poyet*, *supra*, 6 Cal.3d at p. 537.)

The judgment is reversed.

Agliano, P. J., and Elia, J., concurred.