COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, AtLee and Athey
Argued by videoconference


THOMAS KHALED MAAD

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0162-20-4                       JUDGE RICHARD Y. ATLEE, JR.
                                                          JANUARY 19, 2021
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF FREDERICK COUNTY
                                Brian M. Madden, Judge

               Jason E. Ransom for appellant.

               Sharon M. Carr, Assistant Attorney General (Mark R. Herring,
               Attorney General, on brief), for appellee.


       Thomas Khaled Maad was convicted, after a jury trial, of two counts of obtaining money

by false pretenses in violation of Code § 18.2-178 and one count of embezzlement in violation of

Code §§ 18.2-95 and 18.2-111. On appeal, Maad argues that the evidence was insufficient to

support his convictions for obtaining money by false pretenses because the evidence did not

prove that he made a false representation as to a past or existing fact. He also argues that the

evidence did not demonstrate that he had an intent to defraud. We disagree and affirm.

                                    I. BACKGROUND

       "In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial." Gerald v.

Commonwealth, 295 Va. 469, 472 (2018) (quoting Scott v. Commonwealth, 292 Va. 380, 381

(2016)).

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

So viewed, the facts show that Maad owned and operated GoldStar Motor Company ("GoldStar"), located in Frederick County, from February 2007, until it closed in early 2019. In 2016, Maad's business started experiencing financial difficulties. Over the next two years, Maad continued to operate, contributing $380,000 from his retirement accounts and life insurance policies. He also asked Pinnacle Financial Group ("Pinnacle") to further extend his line of credit.

Tim Clark, a special agent with the Virginia Department of Motor Vehicles ("DMV"), met with Maad in February 2018, to investigate a complaint. During their meeting, Maad admitted to Clark that he had approximately seventy customers who did not have titles to the vehicles they had purchased. Clark advised Maad about the applicable laws regarding selling and titling vehicles. Clark testified at trial that a car dealer has thirty days to obtain a title for a sold vehicle and may request an additional sixty days, in thirty-day increments, if there are problems in obtaining a title from a lien holder. If there is a delay in obtaining the title, the DMV creates a "title held record" until the title is received, and the buyer of the vehicle cannot retitle the vehicle until the issue is resolved.

On June 28, 2018, Ethan Caldwell traded in his 2012 Ford F-150 pickup truck to GoldStar and purchased a 2011 Honda Odyssey for $17,527.28, including sales tax and licensing fees. Caldwell made a down payment and financed the remaining $16,500. Caldwell still owed T.D. Auto Financing $21,000 for the pickup, and, as part of the deal, Maad promised to pay off the loan on the pickup and transfer title of the Odyssey to Caldwell. Caldwell testified that he expected GoldStar to pay the sales tax and registration fees.

Within a couple of months, Caldwell received notices from T.D. Auto Financing about past due payments owed on the pickup. Caldwell contacted Maad and asked him about paying off the loan. Maad said that he was going to pay it off, but he only made one payment of $2,000.

Caldwell continued to call Maad, who did not answer the calls and instead responded by text message. As of October 1, 2019, Maad still had not paid off the loan, and the amount owed on the loan was $20,017.20. Additionally, Maad never provided Caldwell with title to the Odyssey. Though Maad had acquired the Odyssey from another car dealer, he never got the title from the dealer. The DMV record listed the Odyssey under "title held" status, and, as of three days before Maad's trial, Caldwell still had not received the title for it.

Zachary Shiley visited GoldStar on July 14, 2018. He traded in his 2011 Jeep Liberty and purchased a 2012 Ford F-150, the same one Caldwell had just traded in. As part of the trade-in of the Jeep, Maad promised to pay off the remaining $6,200 that Shiley owed on the Jeep, but he did not do so. Shiley testified that the "repossession man" came to his house twice to repossess the Jeep for nonpayment. When Shiley contacted GoldStar about these issues, he never received a "reliable response" and got the "run-around" from GoldStar employees. Despite Maad's promise that he could transfer clear title for the pickup, he did not initiate the process to transfer title to Shiley. According to the DMV record, the pickup was still registered to Caldwell and had a lien on the title. Moreover, as of two days before the trial, Maad still had not paid the sales tax and licensing fees as required by the Buyer's Order.

On October 6, 2018, Madison Pugh purchased a 2009 Jeep Wrangler[1] from GoldStar for $18,625, which included $1,098.48 in sales tax and licensing fees. She traded in her 2016 Dodge Dart, on which she still owed $8,900, with the understanding that Maad would pay off the remainder of that loan. When Pugh discovered that the loan had not been paid, she contacted GoldStar and one of Maad's employees told her that they were working on it. The next week,

---

[1] At trial, Jeffery Gay testified that he had traded in his truck and purchased the 2009 Jeep Wrangler from GoldStar in April or May 2018. After Maad failed to pay off the loan on Gay's truck as agreed, Gay returned the Jeep to GoldStar in exchange for the return of his truck.

the employee told Pugh that the check had been sent, but as of the date of trial, the loan was still unpaid, and the Dodge Dart had been repossessed from Maad's lot. Pugh testified that she was told her license plates would be transferred from the Dodge to the Jeep, and she paid fees to cover those expenses. Because Maad did not submit the taxes and fees to the DMV, Pugh had to repay those fees a second time. In fact, Maad did not even start the process to transfer title to the Jeep to Pugh.

Ultimately Maad closed his business. Shortly thereafter, Maad was arrested, and his trial commenced on November 14, 2019. Maad testified on his own behalf. He explained that he never intended to "rip off" Caldwell, Shiley, or Pugh. He testified that his business catered to individuals who could only make low down payments on the vehicle they sought to purchase or those with low credit scores, and GoldStar would often finance vehicle loans when financial institutions refused. This resulted in GoldStar owing more and more money. Maad knew that GoldStar was having "real problems" since 2016, but he explained that he expected Pinnacle to increase his line of credit as it had at other times when he had cash flow issues. He admitted that he did not use the money from selling vehicles to Caldwell, Shiley, or Pugh to pay off the loans on the vehicles they traded in because he used the money for his "most pressing" obligations. He also admitted that when he sold the F-150 pickup to Shiley, he knew that he would not be able to give clear title to the pickup. Maad testified that he relied on DMV Investigator Clark's representations that "when he close[d] down, [the DMV] would take care of the customers."

Maad filed a motion to strike. He argued that the evidence was insufficient to support the charges that he obtained money by false pretenses because the statute requires a false representation of past or existing fact and his promises to pay off the loans on the trade-in vehicles were merely statements of future intentions. He also argued that the evidence was insufficient to support both his obtaining money by false pretenses convictions and his

- 4 -

embezzlement conviction because the evidence did not prove that he intended to defraud any of the customers. The trial court denied the motion to strike, and the jury found Maad guilty on all three charges. The trial court also denied Maad's motion to set aside the verdict, and Maad now appeals to this Court.

## II. ANALYSIS

Maad argues that the evidence is insufficient to support his convictions. "When the sufficiency of the evidence is challenged on appeal, we must '"examine the evidence that supports the conviction and allow the conviction to stand unless it is plainly wrong or without evidence to support it."'" Austin v. Commonwealth, 60 Va. App. 60, 65 (2012) (quoting Commonwealth v. McNeal, 282 Va. 16, 20 (2011)). We review the evidence in the light most favorable to the Commonwealth, as the prevailing party below, Gerald, 295 Va. at 472, and we determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Reid v. Commonwealth, 65 Va. App. 745, 753 (2016) (quoting Ervin v. Commonwealth, 57 Va. App. 495, 502 (2011)). "If there is evidence to support the conviction, we may not substitute our judgment, even if our conclusions of fact differ from the conclusions reached by the fact-finder at trial." Austin, 60 Va. App. at 65-66.

### A. *False Pretenses*

Code § 18.2-178(A) provides that "[i]f any person obtain, by any false pretense or token, from any person, with intent to defraud, money . . . or other property that may be the subject of larceny, he shall be deemed guilty of larceny thereof . . . ." To support a conviction of obtaining money by false pretenses, "the Commonwealth must prove: (a) that the accused intended to defraud; (b) that a fraud actually occurred; (c) that the accused used false pretenses to perpetuate the fraud; and (d) that the false pretenses induced the owner to part with his property." Reid, 65 Va. App. at 748-49 (quoting Wynne v. Commonwealth, 18 Va. App. 459, 460 (1994)).

"A criminal false pretense has been defined to be 'the false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive, and does in fact deceive . . . ." Hubbard v. Commonwealth, 201 Va. 61, 66 (1959). "[T]he false pretense must be a representation as to an existing fact or past event." Id.

> False representations amounting to mere promises or statements of intention have reference to future events and are not criminal within the statute, even though they induce the party defrauded to part with his property. But if false representations are made, some of which refer to existing facts or past events, while others refer solely to future events, a conviction may be had if it is shown that any of the representations as to existing facts induced the complaining witness to part with his property.

Holt v. Commonwealth, 66 Va. App. 199, 209 (2016) (*en banc*) (quoting Parker v. Commonwealth, 275 Va. 150, 154 (2008)).

Maad argues that the Commonwealth failed to prove that he made a false representation of an existing fact or past event. He contends that his promise to pay off the loans on the vehicles Caldwell, Shiley and Pugh traded in, even if false, was a promise or reference to a future event, and therefore, was insufficient to support his convictions.

Maad is correct that his promise to pay off Shiley's and Pugh's loans on the vehicles they traded in is not a false representation under Code § 18.2-178(A). But Maad made other false representations in reference to existing facts or past events by stating that he could provide clear titles for the vehicles that they purchased. He admitted that he knew at the time that he sold the F-150 pickup to Shiley that he could not transfer him clear title because he had not paid off T.D. Auto's lien on the pickup. Furthermore, he was aware of GoldStar's financial difficulties and knew he would not be able to pay the lien off and transfer clear title without some sort of outside intervention. Likewise, the Jeep remained titled in Gay's name, and no effort had been made to attempt to transfer title, and thus Maad was unable to give Pugh title to the Jeep. Both Shiley

- 6 -

and Pugh testified that they would not have purchased vehicles if they knew Maad could not transfer them clear title.

Maad made several false representations. Though some referred solely to future events or statements of intentions, others referred to existing facts or past events. Accordingly, because some of "the representations as to existing facts induced the complaining witness[es] to part with [their] property," the evidence is sufficient to support a conviction. Holt, 66 Va. App. at 209.

### B. *Intend to Defraud*

Madd also argues that the evidence was not sufficient to prove that he had an intent to defraud and therefore the evidence is insufficient to sustain both his obtaining money by false pretenses convictions and his embezzlement conviction.

To convict Maad of obtaining money by false pretenses, the Commonwealth must prove that an intent to defraud existed at the time the false pretenses were made. Riegert v. Commonwealth, 218 Va. 511, 518 (1977). To convict Maad of embezzlement, the Commonwealth must prove that he "wrongfully and *fraudulently* use[d], dispose[d] of, conceal[ed] or embezzle[d] any money . . . personal property . . . which he shall have received for another . . . or which shall have been . . . entrusted or delivered to him by another . . . ." Code § 18.2-111 (emphasis added).

In order to determine whether an intent to defraud existed, "the conduct and representations of the accused must be examined, since intent is 'a secret operation of the mind.'" Riegert, 218 Va. at 519 (quoting Trogdon v. Commonwealth, 72 Va. (31 Gratt.) 862, 872 (1878)). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." Fleming v. Commonwealth, 13 Va. App. 349, 353 (1991).

The evidence is sufficient for a rational fact finder to conclude that Maad did intend to defraud Caldwell, Shiley, and Pugh. Code § 46.2-617 prohibits selling a vehicle without having title to it. Prior to all three sales, Maad admitted to DMV Investigator Clark that he had seventy customers without title to vehicles they had purchased. Clark explained to him the applicable law regarding the proper way to sell and title vehicles. Despite that, Maad continued to sell vehicles to which he did not have, and could not get, clear title. Furthermore, Maad did not take any steps to initiate the process of transferring title to Pugh or Shiley, nor did he request more time from the DMV to get the titles. Although the Buyer's Orders required Maad to pay the sales tax and licensing fees, and he collected money for that purpose, he did not remit that money to the DMV. He also testified that he had no intention of using those funds to do so because all the money coming in was destined for his "most pressing" obligations. Likewise, when Maad sold the pickup that Caldwell traded in, he did not pay off Caldwell's loan. Rather, he used the proceeds to fund other parts of his car business.

Maad had a pattern of doing the same thing to multiple customers. See Austin, 60 Va. App. at 67 ("[E]vidence that the accused 'perpetuated more than one fraud [at] about the same time is relevant to show his fraudulent intent.'" (second alteration in original) (quoting Mughrabi v. Commonwealth, 38 Va. App. 538, 546 (2002))). When those customers attempted to contact him and find out what was going on, he avoided phone calls and gave unreliable answers. Pugh was even falsely told that her loan had been paid off. Evasive conduct "and a general lack of communication with the victims about any problems" are probative of fraudulent intent. Id.

Maad contends that this evidence did not exclude the reasonable hypothesis of innocence that he had simply made bad business decisions without intending to defraud anyone. But his argument is based on information presented in his testimony. The jury, as fact finder, was

- 8 -

entitled to accept or reject his testimony in whole or in part and could "conclude that [Maad was] lying to conceal his guilt." Speller v. Commonwealth, 69 Va. App. 378, 388 (2018). "Determining the credibility of the witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." Dalton v. Commonwealth, 64 Va. App. 512, 525 (2015) (alteration in original) (quoting Lea v. Commonwealth, 16 Va. App. 300, 304 (1993)). Here, the jury plainly rejected Maad's explanation of events and resolved the credibility issues in favor of the Commonwealth. Accordingly, we conclude that the evidence was sufficient to allow the jury to conclude that Maad intended to defraud.

III. CONCLUSION

Because we conclude that the evidence was sufficient to demonstrate that Maad made false representations as to past or existing facts and he had an intent to defraud, we find the evidence sufficient to sustain his convictions. Accordingly, we affirm.

Affirmed.