# COURT OF APPEALS OF VIRGINIA

**Record No. 0351-24-4**

SABRINA G. KNOTT

v.

COMMONWEALTH OF VIRGINIA

**Record No. 0399-24-4**

ALLEN W. KNOTT

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Beales, Raphael and Bernhard

Argued at Arlington, Virginia

Opinion Issued May 12, 2026

## FROM THE CIRCUIT COURT OF PAGE COUNTY
Clark A. Ritchie, Judge

A. Hunter Jackson (Office of the Public Defender, on brief), for appellant Sabrina G. Knott.

Joseph P. Hopson (Joseph P. Hopson, Attorney at Law, PLLC, on brief), for appellant Allen W. Knott.

Sabina B. Thaler, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## PUBLISHED OPINION BY
## JUDGE RANDOLPH A. BEALES

Following a joint jury trial, the Circuit Court of Page County convicted Allen W. Knott and

Sabrina G. Knott, who are spouses, of obtaining money by false pretenses (under Code § 18.2-178)

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

and of construction fraud (under Code § 18.2-200.1). On appeal, the Knotts argue that the circuit court erred by denying their motions to strike the evidence and to set aside the jury's verdict.

## I. Background

Allen and Sabrina Knott operated a roofing company in Page County, Virginia. Allen set up the company, "Knott's Roofing," as a sole proprietorship in 2001. From 2018 to 2021, Sabrina worked for Knott's Roofing as "the customer contact, secretary, bookkeeper." At first, Allen did "a lot of the manual labor." As the company grew, he did "a lot of the estimates, repairs," and "watched my guys." Allen testified that his roofing company initially performed "very well." Eventually, Knott's Roofing experienced financial troubles. By 2018, Knott's Roofing owed nearly $250,000 to their main supplier of roofing materials—ABC Supply Company. That debt was for the materials that the Knotts needed to build roofs. While the Knotts initially made payments of "[a]pproximately $10,000 a month" to ABC Supply Company, they "got to a point that we couldn't make the payments" and ceased making payments "at some point in 2019." The price of materials continued to rise during the COVID-19 pandemic.

Knott's Roofing "started getting behind in 2019" on its roofing jobs. According to Sabrina Knott, they were behind because of the COVID-19 pandemic although the pandemic did not begin in the United States until March 2020. She explained that Knott's Roofing was "having trouble getting supplies" because their "material distributors were running behind because COVID was also affecting them." Despite their debt and struggle to complete jobs, the Knotts continued accepting jobs from customers. They also continued to require that those customers who were signing up for new jobs make large deposits in advance, which were sometimes worth 70 to 80 percent of the contract's value. When Sabrina's counsel asked what she would do with a check that she received from a client "from January 2020 to January 2021," Sabrina said, "Well, if it was made out to Knott's Roofing, I took it to the bank and I deposited it, and the next day I would more than likely

- 2 -

go and write a check out to myself or to Allen and cash it." However, if the client had made the check out to Allen or to Sabrina, Sabrina "took it straight away and cashed it, got the cash out so I could use it to purchase materials." Between January 2020 and January 2021, Sabrina cashed checks to herself that amounted to approximately $252,000. Sabrina was the person who "the majority of the time" reviewed contracts with clients. Each of those contracts referenced an "installation list." Sabrina described the list as "a list that we would put everyone on, on a first come, first serve basis"—and that they "would get to them [the people on the list] in the order that they came in."

Many of the victims who testified at Allen and Sabrina's trial testified to the same set of basic facts: they would reach out to Knott's Roofing, receive an estimate, sign a contract, pay a substantial portion of the value of that contract up front, and then rarely—if ever—hear from Knott's Roofing again. Elaine Harlow testified that her husband signed a contract with Knott's Roofing in January 2020 and paid $12,000 up front, but that she "never saw Mr. Knott again. There were no materials delivered. There was complete silence." Shirley Buracker contacted Knott's Roofing in April 2020 to fix a leaking roof. She "had Allen come up and give me an estimate," signed a contract, and paid over $6,000 up front. The Knotts never worked on her roof and never returned her funds. Mary Hilliards contacted Knott's Roofing in May 2020 for a job and paid them over $2,000 up front. She called the Knotts "five or six times" to see "where I was at on the list," but the Knotts never started the work.

Detective Megan Morris started investigating Knott's Roofing in 2021. On February 11, 2021, Detective Morris spoke with Allen Knott, who "advised that his company had been impacted by Covid-19," that "he had a foot surgery," and that he "was shorthanded with his crew" because of COVID-19. Allen told Detective Morris that Knott's Roofing normally "has a ninety day time line of the completion of construction" on contracts. He also told Detective Morris that the deposits they

were receiving from customers "go to purchasing material," as well as to purchasing "fuel expenses, [and] payroll." However, because Knott's Roofing was behind on completing jobs, Allen told Morris that "the deposits that were collected in 2020 went to purchasing materials for contracts made in 2019." In addition, Allen told Detective Morris that he planned to reduce his debt load by "liquidating some assets to refund the, the customers' deposits" as well as by filing for bankruptcy. Detective Morris also spoke with Sabrina Knott, who told her that the Knotts were considering selling equipment to pay back customers. Neither Allen nor Sabrina explained why they had not already taken some of these steps.

On the day that Detective Morris met with the Knotts, Allen texted Sabrina that he "believe[d] they're going to lock me, no joke. Are you praying?" Sabrina asked Allen to let her know when he was "out of the meeting" with Detective Morris. Allen then texted Sabrina, "It ain't good," before then texting, "They got me." On February 16, 2021, Detective Morris executed search warrants on the Knotts' home and on their roofing business. Cell phones seized during the search revealed text messages that the Knotts had sent to each other. In one message, sent by Allen to Sabrina on December 10, 2020, as read into the transcript, Allen said:

> Hey, I tell you like it is. Let God put it against me for lying.
> Abraham had to do so, so did others, but you be sure to say that
> Covid had us quarantined indoors. All because of homeowner's [sic]
> that spread it, they came to our office and one came out and had
> contact with our help. So if you got to lie, lie big. And lie good. All
> this God can judge me for. It's okay. Inform them we asked for
> their cooperation and we will help them out at the end of the job with
> a discount. That usually cools them off.

On January 19, 2021, he texted Sabrina, "Find out who we need to talk to or tell about court. I'm very sick and I take all responsibility for the false stories. Let God judge me for it."

On October 30, 2023, the parties appeared for a jury trial on the charges that the Commonwealth had brought against the Knotts, which included charges for construction fraud, conspiracy to commit construction fraud, obtaining money by false pretenses, and conspiracy to

- 4 -

obtain money by false pretenses. At the start of the trial, the circuit court judge explained that by his "count there are twenty-five counts of construction fraud against Mr. Knott, twenty-five against Mrs. Knott. One conspiracy to do the same for each. Twenty-six charges for obtain money by false pretenses against each defendant. One conspiracy against each defendant to do the same."

Multiple alleged victims of the Knotts testified throughout the trial, including Jory Lawson. He contacted Knott's Roofing in April 2020 for a roof replacement. He also testified that Allen showed up to his property after he contacted the company and that he paid $5,500 up front for the job. He also said that the job was to be completed in "like three months or less." After hearing nothing further from the Knotts, Jory Lawson "inquired several times to Sabrina and [received] various excuses every time" from her, and he said that she was always the person who answered the phone at Knott's Roofing. "One time it was Covid that was causing them a problem." Another time Sabrina "said one or more of her workers had fallen." After the police advised Jory Lawson to submit "a fifteen day form notice letter" to the Knotts, he testified that he sent a signed letter by "[c]ertified mail" to the Knotts demanding that they return his money. The copy of the letter submitted by the Commonwealth at trial showed "[t]he certified request at the post office and the receipt that it was delivered." The Knotts never returned Jory Lawson's money.

Nathan Kuhn testified that he contacted Knott's Roofing in May of 2020 and that Allen Knott then came by his property to discuss an estimate. Allen came back "a couple hours later" with a contract and Nathan Kuhn paid $5,000 up front. Nathan Kuhn said that was "[t]he only time I met Allen." He contacted the Knotts "a couple months later" to see why no progress had been made. He "talked to Sabrina probably a dozen times" and received "all these excuses." Sabrina would tell him "you're number twenty-five, you're number thirty-five, you're number fifteen and so on." He started to get suspicious after Sabrina told him "you're number ten, you're number fifteen" but "then all of a sudden health issues and so forth." Eventually, just like Jory Lawson, Nathan

Kuhn submitted a 15-day notice letter demanding his money back. Nathan Kuhn testified that he sent the demand letter "regular mail" but almost immediately changed his answer and said, "I think that was certified. I believe it was certified." The Commonwealth submitted a copy of the return receipt into the record. At the time of trial, Nathan Kuhn's roof had not been fixed, and he had not received any money back from the Knotts.

Joan Jackson contacted Knott's Roofing in July of 2020, signed a contract with them, and paid $7,000 up front. The contract was supposed to be completed by "the end of November, the first of December." Joan Jackson contacted the Knotts in November. They told her that "they would get to us" but "they didn't get to us. So in December, a few weeks later, I called to check to see when we're on the schedule." Eventually, "Sabrina stopped taking our calls from my cell phone. So the next time a few weeks later" Joan's husband Robert Jackson called "from his cell phone." Robert Jackson testified that when he called from his phone, the Knotts "answered right away." However, "[a]s soon as I said when is the work going to be done and when is our money going to get returned to us, I got hung up on and blocked too." He then "called from our home phone." The Knotts again "answered right away," but when Robert Jackson "said who I was I got hung up on again." The Knotts never refunded the money to Joan Jackson and never started any work on her roof. After contacting the police, the Jacksons sent a 15-day demand letter asking the Knotts to return their money and the Commonwealth submitted a copy of their return receipt into the record. Robert Jackson testified that they sent the letter by certified mail.

Clay Mayes testified that he contacted Knott's Roofing in November of 2020 for a job. Allen Knott showed up at the property and gave Clay Mayes an estimate. The contract was supposed to be completed by January 31, 2021. After the January 31 deadline passed, Mayes submitted a 15-day demand letter to the Knotts. He testified that he sent the letter "[b]y certified mail," but he did not testify whether he sent the letter return receipt requested, and the

Commonwealth did not submit a copy of the return receipt into the record. The Knotts never started the project on Clay Mayes's roof.

Roy Campbell contacted Knott's Roofing in January of 2021. Allen Knott came to Campbell's property, the two agreed on an estimate for the job, Campbell paid $6,000 up front, and Allen told Campbell that "probably within a month he'd have it [the roof] done." That was the last conversation that he had with Allen Knott. Campbell also sent a 15-day demand letter to the Knotts. When asked by the Commonwealth's counsel how he sent the letter to the Knotts, Campbell said, "I sent it by—they had to sign to get it. Of course you got a copy of it, don't you?" When the Commonwealth asked Roy Campbell whether he sent the letter "just [by] regular mail," he said, "Yes. They had to sign, yes." The Commonwealth then described the letter as including "the return receipt from certified mail." However, Campbell never testified that he sent the demand letter by certified mail. The Knotts never returned Campbell's money or started the project.

James Comer, son of Joyce Comer—who was 87 at the time of trial—testified that he contacted Knott's Roofing in August of 2020 to complete work on his mother's roof. James Comer "talked to Allen," who said he would "get back with me and give me an estimate." Joyce Comer put down $5,000 up front for the job. James Comer stated that Sabrina Knott then told him that the job would be completed probably by late fall. He called the Knotts multiple times the following January because the job had not been started, but he never heard back from them. James Comer stated during trial that "[y]esterday is the first time I saw them." He further stated that he and his mother sent a 15-day demand letter to the Knotts by certified mail asking for their money back, and the Commonwealth submitted a copy of the return receipt from that letter into the record.

After the Commonwealth's case in chief, the Knotts made a motion to strike all of the charges as to Donnie Good and Pamela Morris because "they were unable to appear" at trial as well as the construction fraud charges as to Britton Bosarg, Joyce and James Comer, Joan Jackson, Jory

Lawson, Nathan Kuhn, Roy Campbell, and Victor Foster.[2]  The Knotts argued that the demand letters sent by these alleged victims did not comply with Code § 18.2-200.1 because the "certified mail" box on the return receipts for those letters had not been checked.  The circuit court "den[ied] the motion to strike at this point giving every full and fair inference to the Commonwealth."  The Knotts then also moved to strike the obtaining money by false pretense charges.[3]  The circuit court granted the motion "on the charges for the folks that were not here today" but denied the motion as to the other alleged victims.  In addition, the Commonwealth ultimately agreed to the striking of the construction fraud charges against the Knotts as to Victor Foster.

At the close of the evidence, the Knotts renewed their motion to strike the construction fraud charges and the charges for obtaining money by false pretenses.  The Knotts restated their earlier argument against the construction fraud charges, claiming that "USPS determines how its [mail is] actually sent, not these people testifying that they think they sent it certified."  They also restated their earlier argument against the false pretense charges—stating that they did not make any false statements.[4]  After considering the arguments, the circuit court denied the Knotts' renewed motions to strike.

At the end of trial, the jury found Allen Knott guilty of 24 counts of obtaining money by false pretenses, 21 counts of construction fraud, 1 count of conspiracy to obtain money by false pretenses, and 1 count of conspiracy to commit construction fraud.  The jury also found Sabrina

---

[2] Sabrina's counsel entered the motion while Allen's counsel joined the motion.

[3] Sabrina's counsel entered a motion to strike the obtaining money by false pretense charges against her.  Allen's counsel also entered a separate motion to strike the obtaining money by false pretense charges against him.

[4] Sabrina's counsel first entered the motions to strike, Allen's counsel joined Sabrina's counsel's argument against the construction fraud charges, and Allen's counsel made a separate argument that the false pretense charges against his client should be struck because his client did not make a false statement.

Knott guilty of 24 counts of obtaining money by false pretenses, 21 counts of construction fraud, 1 count of conspiracy to obtain money by false pretenses, and 1 count of conspiracy to commit construction fraud. Both Knotts filed motions to set aside the verdict, which the circuit court denied from the bench.

On March 20, 2024, the circuit court entered orders sentencing both Sabrina and Allen to 141 years of incarceration with all but 4 years and 6 months suspended. However, Sabrina's sentencing order incorrectly listed her as having been convicted of construction fraud in case number CR22F00244 although she had actually been acquitted under that case number. In addition, the sentencing order lists her as having been convicted of construction fraud in CR22F00217 and of obtaining money by false pretenses in CR22F00215, even though the jury verdict forms for those offenses state that Sabrina was instead convicted of *conspiracy* to commit each of those crimes. Furthermore, Allen's sentencing order lists him as having been convicted of construction fraud in CR22F00085 and of obtaining money by false pretenses in CR22F00083 even though the jury verdict forms for those offenses state that Allen was instead convicted of *conspiracy* to commit each of those crimes. Sabrina and Allen now appeal to this Court.

## II. ANALYSIS

"Issues of statutory construction are questions of law which we review de novo." *McKee Foods Corp. v. County of Augusta*, 297 Va. 482, 495 (2019). However, Virginia appellate courts "review factfinding with the highest degree of appellate deference." *Bowman v. Commonwealth*, 290 Va. 492, 496 (2015). As the Supreme Court has repeatedly said, "When faced with a challenge to the sufficiency of the evidence supporting a criminal conviction, an appellate court is faced with the limited task of determining 'whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Cuffee v. Commonwealth*, ___ Va. ___, ___ (Apr. 16, 2026) (emphasis in original) (quoting *Commonwealth v. Garrick*, 303 Va. 176, 182

(2024)).  "This appellate inquiry begins with the presumption that the decision in the circuit court is correct and cannot 'be disturbed unless it is "plainly wrong or without evidence to support it."'" *Id.* at ___ (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)).  The Supreme Court has also been clear that "an appellate court is *required* to review the evidence in the light most favorable to the Commonwealth, the prevailing party in the trial court, and to accord the Commonwealth the benefit of all reasonable inferences deducible from the evidence."  *Id.* at ___ (emphasis in original) (quoting *Garrick*, 303 Va. at 182).

### A.  The Knotts' Return Receipt Challenges

On appeal to this Court, Allen Knott argues, "The Circuit Court erred in overruling Defendant's Motion to Strike and Motion to Set Aside the Verdict as the Construction Fraud Charges, as the return receipt from the United States Post Office was no[t] marked."  Sabrina Knott similarly argues, "The trial court erred in denying Appellant's Motion to Strike the Evidence, her Renewed Motion to Strike the Evidence, and her Motion to Set Aside the Verdict on select Construction Fraud Charges, as the return receipt on those charges did not mark the box showing the letters were sent via certified mail."

In short, in their first assignments of error, the Knotts specifically challenge the construction fraud charges brought against them by the Commonwealth as to Jory Lawson, Nathan Kuhn, Roy Campbell, Clay Mayes, Joyce Comer, and Joan Jackson.[5]  A person is guilty of construction fraud when they:

> obtain from another an advance of money, merchandise or other thing, of value, with fraudulent intent, upon a promise to perform construction, removal, repair or improvement of any building or structure permanently annexed to real property, or any other improvements to such real property, including horticulture, nursery

---

[5] Because the Knotts only challenge the "certified mail, return receipt requested" requirement as to these specific individuals, they have waived the ability to challenge that specific requirement in Code § 18.2-200.1 as to the other guilty verdicts at issue in this case.  *See* Rule 5A:20.

> or forest products, and fail or refuse to perform such promise, and also fail to substantially make good such advance, he shall be deemed guilty of the larceny of such money, merchandise or other thing *if he fails to return such advance within fifteen days of a request to do so sent by certified mail, return receipt requested*, to his last known address or to the address listed in the contract.

Code § 18.2-200.1 (emphasis added). The requirement that the demand letter be sent "by certified mail, return receipt requested" is an "element[] of a statutory crime" and thus "involves a purely legal question that we review de novo." *Bowman*, 290 Va. at 496-99. *See also Jimenez v. Commonwealth*, 241 Va. 244, 251 (1991). "This 'notice requirement,' we have emphasized, is a 'material element' of the statutory offense." *Bowman*, 290 Va. at 498 (quoting *Jimenez*, 241 Va. at 251). In *Bowman*, the Supreme Court reversed Bowman's conviction under Code § 18.2-200.1 because the demand letter received by Bowman was not entered into evidence, and the homeowner who sent the letter testified that he asked Bowman either to return his money or to return some materials. *Id.* at 499-501. The Supreme Court explained that "the statutory notice requirement" in Code § 18.2-200.1 could not "be satisfied by an alternative demand for *either* continued partial performance of the contract . . . *or* a return of the advance." *Id.* at 499-500 (emphases in original).

In *Holsapple v. Commonwealth*, 266 Va. 593, 598-600 (2003), the Supreme Court discussed the phrase "certified mail, return receipt requested" in Code § 18.2-200.1. The Supreme Court ruled that "certified mail, return receipt requested" was not ambiguous and stated, "The language of Code § 18.2-200.1 plainly means that a request for a return of money advanced on a construction project is sufficient notice if sent by certified mail, return receipt requested, without proof of actual receipt." *Id.* at 599. Thus, the Supreme Court concluded that the Commonwealth did not have to provide affirmative proof that a person had actually received a demand letter for that person to be convicted of construction fraud. *Id.* at 595-99. The Supreme Court compared the language in Code § 18.2-200.1 to the language in Code § 18.2-183, which requires a victim to send a written notice letter "by certified or registered mail, *evidenced by return receipt*, to the last known

- 11 -

address of" the defendant. *Id.* at 599 (emphasis in original) (quoting Code § 18.2-183). Because Code § 18.2-200.1 does not by its terms require that the certified mail be "evidenced by return receipt," and because Code § 18.2-183 did, the Supreme Court ruled the Commonwealth did not have to provide evidence of actual receipt in cases concerning Code § 18.2-200.1.

The Knotts are correct that the circuit court erred when it failed to grant their motions to strike the construction fraud charges against them as to Clay Mayes and Roy Campbell. Indeed, the Commonwealth concedes on brief that the circuit court should have struck the charge as to Clay Mayes because it "presented no evidence that he requested a return receipt as required by Code § 18.2-200.1." The circuit court also should have struck the charges as to Roy Campbell because he testified that he sent his demand letter simply by *regular* mail—not by *certified* mail. The Commonwealth also did not submit a receipt that would prove that, even though Campbell did not testify that he sent his letter by certified mail, Campbell did actually send his letter by certified mail. Thus, the Commonwealth simply failed to present enough evidence to support the jury's construction fraud verdict as to Roy Campbell because neither Campbell's testimony nor the documents submitted by the Commonwealth showed that Campbell sent his demand letter by certified mail, return receipt requested. Therefore, the Commonwealth did not present enough evidence to support the jury's verdicts with regard to the convictions of Allen and Sabrina Knott for construction fraud involving Clay Mayes and Roy Campbell and we reverse those two convictions and dismiss the indictments.

However, the circuit court did not err when it denied the Knotts' request to strike the construction fraud charges against them regarding Jory Lawson, Nathan Kuhn,[6] Joyce Comer,

---

[6] Allen Knott's notice of appeal lists CR22F00115 as one of the case numbers that he is appealing. However, CR22F00115 is not a case number listed in Allen's final sentencing order. Instead, the sentencing order lists Allen as having been convicted in case number CR22F00116, but Allen's notice of appeal does not include case number CR22F00116. On brief, Allen states that CR22F00116 is "the construction fraud charge regarding Nathan Kuhn." Thus, even if

and Joan Jackson. Each of those victims (or their representatives) testified that they sent their demand letters to the Knotts by certified mail and the Commonwealth submitted copies of the return receipts for those victims into the record. James Comer appeared on behalf of his mother, Joyce Comer, and testified that he sent his mother's demand letter by certified mail. The Commonwealth also submitted a copy of her return receipt into the record. Joan and Robert Jackson testified that they sent their demand letter by certified mail, and the Commonwealth presented a return receipt for that demand letter at trial. Nathan Kuhn also testified that he sent his letter by certified mail, and the Commonwealth also submitted a copy of the return receipt for his demand letter. Finally, Jory Lawson testified that he sent his demand letter by certified mail, and the Commonwealth likewise presented a return receipt for that demand letter at trial.

The testimony of these victims, combined with the return receipts (from their demand letters) submitted by the Commonwealth, are enough to satisfy the requirement in Code § 18.2-200.1 that a victim submit a demand letter by certified mail, return receipt requested. The plain language of the statute does not *require* the Commonwealth to submit documents showing that a letter was sent by certified mail with a return receipt requested. Instead, the statute gives the jury the ability to decide whether the demand letter was sent appropriately based on a victim's testimony. The Supreme Court stated as much in *Bowman*, where it held that a victim's mere testimony about the contents of his demand letter would have been "more than sufficient to permit the inference that the homeowner's letter" complied with the statute if the victim's

Allen were correct and his construction fraud charge as to Nathan Kuhn should have been struck, he failed to properly appeal that conviction to this Court. *See* Rule 5A:6 ("[N]o appeal will be allowed unless, within 30 days after entry of final judgment or other appealable order or decree, or within any specified extension thereof granted by this Court under Rule 5A:3(a), counsel files with the clerk of the trial court a notice of appeal . . . ."). Because Allen Knott never appealed his conviction for committing construction fraud against Nathan Kuhn, he has waived his challenge to that conviction.

testimony had not revealed that the demand letter asked for either a return of the victim's money or continued performance of the contract. 290 Va. at 500.

In addition, unlike Code § 18.2-183, which requires a victim to send a written notice letter "by certified or registered mail, *evidenced by return receipt*," Code § 18.2-200.1 only requires that a victim send a notice letter "by certified mail, return receipt requested." *Holsapple*, 266 Va. at 599 (emphasis in original). The Supreme Court has clearly stated, "[W]hen the General Assembly has used specific language in one instance but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional." *City of Hampton v. Williamson*, 302 Va. 325, 335 (2023) (alteration in original) (quoting *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011)). The omission of the words "evidenced by" from Code § 18.2-200.1 shows that the General Assembly did not intend to require the Commonwealth to submit a physical return receipt into the record to obtain a conviction for a violation of Code § 18.2-200.1.

Despite what the Knotts might claim, Code § 18.2-200.1 does not require that return receipts submitted into the record by the Commonwealth have the "certified mail" box on those receipts filled in by the post office clerk. Lawson, Kuhn, Comer, and Jackson each testified that they sent their demand letters by certified mail. The fact that the return receipts for Lawson, Kuhn, Comer, and Jackson do not have the "certified mail" box filled in by the post office is simply not enough to prevent a rational factfinder (here the jury) from finding that the demand letter was sent by certified mail—and that the Knotts did indeed commit construction fraud against those persons. Indeed, even if there were some concern that a failure to check the "certified mail" box on a return receipt implied that a person did not actually send their demand letter by certified mail, the record in this case shows that a victim here did send a letter by certified mail, return receipt requested without the "certified mail" box being checked. Jory Lawson testified that he sent his demand letter by

certified mail, and the "certified mail" box on his return receipt was still not checked. However, the Commonwealth also presented an accompanying receipt into the record that showed that Jory Lawson paid for certified mail delivery and that he received confirmation from the post office that his demand letter was sent by certified mail and delivered to the Knotts.

Thus, the victims here testified that they sent their demand letters by certified mail, the Commonwealth submitted return receipts into the record (even showing those demand letters were actually delivered to the Knotts), and the record affirmatively shows that the "certified mail" box on a return receipt can remain unchecked even when someone explicitly paid for his demand letter to be sent by certified mail. Consequently, we simply cannot say that the circuit court erred when it did not grant the Knotts' motions to set aside the verdict on the construction fraud charges as to Jory Lawson, Joyce Comer, Nathan Kuhn, and Joan Jackson.

### B. The Knotts' Other Construction Fraud Charges

On brief, Allen argues, "The Circuit Court erred in overruling Defendant's Motion to Strike and Motion to Set aside the verdict, as there was insufficient evidence to convict the Defendant of Construction Fraud." On brief, Sabrina argues,

> The trial court erred in denying Appellant's Motion to Strike the Evidence, her renewed Motion to Strike the Evidence, and her Motion to Set Aside the Verdict on the construction fraud charges because there was insufficient evidence to convict her, including a lack of evidence establishing her fraudulent intent at the time she procured the advance of money.

"To determine whether or not there was fraudulent intent" within the context Code § 18.2-200.1, "we look to the conduct and representations of the defendant." *Norman v. Commonwealth*, 2 Va. App. 518, 519 (1986). "Circumstances implying fraudulent intent include a contractor's false statements, subsequent failure to perform the work, failure to use the advanced funds to purchase supplies or to hire needed labor, efforts to avoid communicating with the homeowner, and refusal to return the advanced funds." *Dennos v. Commonwealth*, 63

Va. App. 139, 145-46 (2014) (citations omitted) (collecting cases). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from facts that are within the province of the trier of fact." *McCary v. Commonwealth*, 42 Va. App. 119, 126-27 (2003) (quoting *Ellis v. Commonwealth*, 29 Va. App. 548, 555 (1999)).

The evidence presented by the Commonwealth is more than enough to allow a rational factfinder (here the jury) to conclude that the Knotts committed construction fraud because they had a fraudulent intent at the time they signed the disputed contracts with the victims in this case.[7] Numerous victims testified to essentially the same story: they contacted the Knotts for help repairing or replacing their roofs, at which point Allen Knott would show up, provide an estimate, and then leave the premises. Sabrina Knott would later contact the victim to help them sign a contract, and the Knotts would request an advance amounting to a significant portion of the entire contract value—with one victim testifying that she paid $12,000 up front for a project that the Knotts never did. The Knotts would then fail to complete the work for the victims—and often fail even to begin any work. Whenever the victims tried to contact the Knotts to find out when they would begin the work, the Knotts would either (1) promise to move the victims up the "list" of people for whom they claimed they were doing work (while never actually doing work on the victim's home) or (2) avoid talking or having contact with the victims at all.

The record shows that the Knotts continued to sign contracts with one individual after another despite knowing that they had amassed a debt of nearly $250,000 to their primary supplier of roofing materials. They also sent text messages to each other that revealed that they were aware, as they accepted more deposits for future promised work, of their inability to

---

[7] Allen's assignment of error seems to address each of the elements of construction fraud. However, on brief, Allen only argues that he lacked fraudulent intent at the time he signed the contracts with the victims. Sabrina's assignment of error focuses on whether she had fraudulent intent, and on brief she too argues only that she lacked fraudulent intent. Thus, the only element of construction fraud at issue in either Allen's appeal or Sabrina's appeal is fraudulent intent.

complete work for even the current customers who were in line ahead of the new ones, whose money they took while making promises they would soon complete that work. Allen texted Sabrina on December 10, 2020 and actually told her in that text that, if needed, she should "lie big. And lie good." In that same message, Allen told Sabrina to tell the customers that they would "help them out at the end of the job with a discount" because "[t]hat usually cools them off." Sabrina's many phone calls with the various victims also revealed that she was simply trying to stall for time without any intent of actually completing the work promised on the victims' contracts. Nathan Kuhn, Jory Lawson, and Joan Jackson all testified that they received various excuses from Sabrina when they called in to ask why the work promised in their contracts had not been completed. Jory Lawson "inquired several times to Sabrina and [received] various excuses every time." Nathan Kuhn "talked to Sabrina probably a dozen times" and started to get suspicious after Sabrina told him "you're number ten, you're number fifteen" but "then all of a sudden health issues and so forth." Joan Jackson testified that "Sabrina stopped taking our calls from my cell phone" but that Sabrina "answered right away" when her husband, Robert, called. When Sabrina learned that Robert Jackson was calling on behalf of Joan, Mr. Jackson "got hung up on and blocked too."

In short, the extensive testimony provided by the many victims of the Knotts was certainly enough to show that the Knotts fraudulently intended to take the money of those victims without the intent to complete the promised roofing projects for them. The Knotts (1) made false statements to their victims by promising to complete roofing work for them that they failed to complete and by promising to move them up "the list" of customers; (2) failed to perform work on those victims' contracts; (3) tried to hide from their victims or cut contact off with them after receiving a significant downpayment; (4) and never returned any money to those victims. *See Dennos*, 63 Va. App. at 145-46 ("Circumstances implying fraudulent intent include

- 17 -

a contractor's false statements, subsequent failure to perform the work, . . . efforts to avoid communicating with the homeowner, and refusal to return the advanced funds." (citations omitted)). While the Knotts did claim that they always intended to complete the contracts at issue, "the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." *Washington v. Commonwealth*, 75 Va. App. 606, 616 (2022) (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011)). Therefore, given all of the information available to the jury and to the circuit court judge, we simply cannot say that the circuit court erred when it denied the Knotts' motions to strike and did not grant the Knotts' motions to set aside the verdict—or that there was no credible evidence supporting the jury's verdict finding the Knotts guilty of the remaining construction fraud charges at issue in this case.

C. The Knotts' Obtaining Money by False Pretense Charges

On appeal, Allen argues, "The Circuit Court erred in overruling Defendant's Motion to Strike and Motion to Set Aside the Verdict, as there was insufficient evidence to convict the Defendant of Obtaining Money by False Pretense." Sabrina similarly argues,

> The trial court erred in denying Appellant's Motion to Strike the
> Evidence, her renewed Motion to Strike the Evidence, and her
> Motion to Set Aside the Verdict on the charges of obtaining money
> by false pretenses, as there was insufficient evidence to convict
> her, including a lack of evidence demonstrating that she made a
> false representation of a past event or existing fact.[8]

Under Code § 18.2-178, any person who obtains "by any false pretense or token, from any person, with intent to defraud, money, a gift certificate or other property that may be the

_____

[8] Sabrina Knott's final sentencing order includes her conviction for obtaining money by false pretenses in case number CR22F00318. However, we note that the circuit court did not fill out any information on page 18 of that final sentencing order indicating the amount of time that it intended for Sabrina Knott to serve for that conviction. As explained *infra*, since this Court is already remanding for resentencing on all of the remaining convictions in this case that we have affirmed, we also order that the circuit court correct this error on remand as well.

subject of larceny, he shall be deemed guilty of larceny thereof." Code § 18.2-178. The Supreme Court has clearly defined the elements for obtaining money by false pretenses.

> [T]he Commonwealth must prove: "(1) an intent to defraud; (2) an actual fraud; (3) use of false pretenses for the purpose of perpetrating the fraud; and (4) accomplishment of the fraud by means of the false pretenses used for the purpose, that is, the false pretenses to some degree must have induced the owner to part with his property."

*Holt v. Commonwealth*, 66 Va. App. 199, 208 (2016) (en banc) (quoting *Riegert v. Commonwealth*, 218 Va. 511, 518 (1977)). For a defendant to be guilty of criminal false pretense, "the false pretense must be a representation as to an existing fact or past event. False representations amounting to mere promises or statements of intention have reference to future events and are not criminal within the statute, even though they induce the party defrauded to part with his property." *Id.* at 209 (quoting *Parker v. Commonwealth*, 275 Va. 150, 154 (2008)).[9]

In *Reid v. Commonwealth*, 65 Va. App. 745, 753-54 (2016), this Court found the defendant guilty of obtaining money by false pretenses when he claimed that he needed money to retrieve his allegedly towed car but then seemingly used the money he obtained from victims to do other things, and never actually retrieved his supposedly towed vehicle. In *Maad v. Commonwealth*, No. 0162-20-4, slip op. at 6, 2021 Va. App. LEXIS 8, at *9 (Jan. 19, 2021), this Court found that the defendant made "false representations in reference to existing facts or past events by stating that he could provide clear titles" to vehicles that he sold to his victims to which he actually did not have title. Maad sold a pickup truck to a victim and said "that he could

---

[9] Allen Knott's and Sabrina Knott's assignments of error seem to address each of the elements of obtaining money by false pretenses. However, on brief, the Knotts only address whether they made a false representation of a past or existing fact and whether any false representation they made caused the victims to part with their money. Thus, this Court need not address here the other elements of obtaining money by false pretenses.

transfer clear title for the pickup." *Id.*, slip op. at 3, 2021 Va. App. LEXIS 8, at *4. However, Maad knew his statement was false because the pickup was not registered in his name and "had a lien on the title." *Id.* Maad also sold a Jeep to another victim. *Id.*, slip op. at 3-4, 2021 Va. App. LEXIS 8, at *4-5. However, he never obtained title to the Jeep, and he made no "attempt to transfer title, and thus Maad was unable to give" the victim title to the Jeep. *Id.*, slip op. at 6-7, 2021 Va. App. LEXIS 8, at *9-10. When these victims attempted to contact Maad's business, they "got the 'run-around' from" Maad's employees. *Id.*, slip op. at 3, 2021 Va. App. LEXIS 8, at *4. Maad was also aware that his company "was having 'real problems' since 2016, but he explained that he expected [his bank] to increase his line of credit." *Id.*, slip op. at 4, 2021 Va. App. LEXIS 8, at *6.

In *Hubbard v. Commonwealth*, 201 Va. 61, 66 (1959), the Supreme Court affirmed the defendant's conviction for engaging in a criminal false pretense. There, the victim sold a car to the defendant after the defendant told the victim that "the condition of his business was 'very, very good'" and that "he would have in bank sufficient funds to meet the check when it was presented for payment." *Id.* The Supreme Court explained that the defendant's representations were false "because the evidence clearly shows that his business was not in sound condition, nor had he in fact consummated the necessary arrangements with the bank in order to insure the payment of the check." *Id.* In reaching its decision, the Supreme Court also considered that the defendant's false representations to the victim were "not an isolated transaction" because the defendant "had perpetrated similar frauds about the same time on other persons and by means of such false representations had obtained cars from them." *Id.* at 67.

Here, Allen and Sabrina Knott both made false representations of existing or past facts to their victims. The Knotts accepted large downpayments from their victims and promised their victims that they would be able to complete those projects within set periods of time. Jory

- 20 -

Lawson testified that he and Allen Knott discussed a timeline for the job on his home and that "it was like three months or less." Nathan Kuhn testified that Allen told him that his job would be completed "[i]n the course of a month or two." Joan Jackson testified that the Knotts told her that they would install a new roof by "the end of November, the first of December." Shirley Buracker, who signed a contract with the Knotts in April of 2020, testified that Sabrina told her that "they could get to it within several weeks." Sabrina Knott told James Comer that the Knotts could complete his job "by late fall." Despite these statements by Sabrina and Allen Knott, the Knotts did not even begin any work on any of these projects, even though they received thousands of dollars as a deposit on each contract. When these victims contacted the Knotts to see why their jobs had not even been started, Sabrina would provide evasive answers, as noted *supra*. While making these promises, the Knotts would continue to sign new contracts with even newer victims, and Sabrina would continue cashing a quarter of a million dollars of checks to herself. The Knotts kept taking on new projects throughout 2020—and accepting very large deposits in the thousands of dollars—even though they had already amassed a debt of nearly $250,000 to their main supplier of roofing materials. They kept taking on these new projects even though they knew that they could not perform the new work (even as they were promising to do it by a certain time) as (1) they could not perform the work they already had for their current customers—and (2) they were deeply in debt to their primary supplier of materials for their roofing jobs.

Given these facts, we simply cannot say that the circuit court erred when it overruled Allen and Sabrina's motions to strike and did not grant their motions to set aside the verdict. The facts available to the jury were certainly enough for a "rational trier of fact" to "have found the essential elements of the crime beyond a reasonable doubt." *Haefele v. Commonwealth*, 75 Va. App. 591, 602 (2022) (quoting *Crowder v. Commonwealth*, 41 Va. App. 658, 663 (2003)).

- 21 -

The jury was presented with plenty of evidence to conclude that, like the defendants in *Hubbard* and *Maad*, the Knotts knew that they were making false statements to their victims at the time that they made those statements that induced those victims to then give the Knotts thousands of dollars in a deposit for jobs that the Knotts knew they could not complete. The jury could certainly find that the Knotts were not merely promising to do something that they were later unable to accomplish, but rather that the Knotts knew *at the time that they entered into contracts with their victims* and made these statements about when the work would be completed that they would be unable to do so. Indeed, just like in *Hubbard* and *Maad*, the jury here could conclude that the Knotts were not only aware of their desperate financial situation but also aware that their financial situation made them unable to complete the contracts at the very time they entered into those agreements committing to do so. The jury could also find that, like the defendant in *Reid* who asked for money to retrieve a towed car that likely did not exist, the Knotts promised to complete projects with resources that they did not have and with supplies that they could not buy. Thus, as this Court in *Watson v. Commonwealth*, 4 Va. App. 450, 453 (1987), said, "Whether the defendant's explanation was true was a question of fact to be determined by the jury," and the jury was free to conclude that the Knotts were lying—and that the Knotts' actions "could only be explained by [their] having obtained [the victims' money] through the use of false pretenses."

### III. CONCLUSION[10]

For all of the foregoing reasons, we affirm the circuit court's judgment in part, reverse it in part, and remand for resentencing on the remaining convictions that we have affirmed—and for other actions below in the circuit court that we have noted consistent with this opinion.

*Affirmed in part, and reversed and remanded in part.*

---

[10] As noted *supra*, the final sentencing orders contain errors. Sabrina Knott's sentencing order incorrectly listed her as having been convicted of construction fraud in case number CR22F00244 when she had actually been acquitted under that case number so we reverse that conviction and remand for the circuit court to vacate that conviction. The final sentencing order also lists her as having been convicted of construction fraud in CR22F00217 and of obtaining money by false pretenses in CR22F00215, even though the jury verdict forms for those offenses state that Sabrina was instead convicted of conspiracy to commit those offenses. Furthermore, Allen Knott's sentencing order likewise lists him as having been convicted of construction fraud in CR22F00085 and of obtaining money by false pretenses in CR22F00083 even though the jury verdict forms for those offenses state that Allen was instead convicted of conspiracy to commit those offenses. We remand these convictions so that these clerical errors can be corrected to correspond to the convictions found by the jury. Code § 8.01-428(B). Finally, because the sentencing orders state that the Knotts have been convicted of crimes for which they were not convicted, and because we are reversing other convictions, this Court remands for resentencing on all the remaining convictions that we have affirmed in these appeals.